IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

CRYSTAL LOUDE                                                                    PLAINTIFF

v.                           NO. 2:17-cv-00067 PSH

NANCY A. BERRYHILL, Acting Commissioner                                          DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Crystal Loude ("Loude") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Loude maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] It is Loude's contention that the ALJ gave inadequate reasons for discounting the opinions of Dr. Kenneth Chan, D.O., ("Chan"), Loude's treating physician, with respect to Loude's migraine headaches.

The record reflects that Loude was born on November 10, 1979, and was thirty-five years old when she filed her application for supplemental security income payments on February 5, 2015. She alleged in the application that she became disabled as a result of, inter alia, her migraine headaches.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id.

The ALJ must evaluate the claimant's subjective complaints as a part of assessing his residual functional capacity. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering all of the evidence, including the following:

> … [the] objective medical evidence, the claimant's work history, and evidence relating to the factors set forth in Polaski v. Heckler, 739 F.3d 1320, 1322 (8th Cir. 1984): (i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions. … An ALJ need not expressly cite the Polaski factors when … [he] conducts an analysis pursuant to 20 C.F.R. 416.929 because the regulation "largely mirror[s] the Polaski factors." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007); see 20 C.F.R. 416.929(c)(3)(i)-(iv), (vii) (2011) …

See Vance v. Berryhill, 860 F.3d 1114, 1120 (8th Cir. 2017).

A summary of the evidence relevant to Loude's migraine headaches reflects that on October 11, 2013, she presented to Dr. James Beaton, M.D., ("Beaton") complaining of cold symptoms and low back pain. See Transcript at 473-475. During the course of the examination, she complained of migraine headaches. He credited her self-report and diagnosed migraine headaches. He recommended Topamax and referred her to Chan, a neurologist, for an evaluation of the headaches.

Beginning on January 18, 2014, and continuing through February 19, 2014, Loude sought treatment from a chiropractor on nine occasions. See Transcript at 292-297. The chiropractor's progress notes are relevant to Loude's migraine headaches because she repeatedly denied headaches but complained of pain in her neck, shoulders, arms, back, hips, and legs.

On March 13, 2014, Loude presented to Beaton complaining of a migraine headache. See Transcript at 350-351. He recorded her history of present illness and noted the following:

> MS. LOUDE presents with classic migraine. [She] was diagnosed with migraine headaches > [i.e., greater than or more than] 10 years ago. Typical precipitating factors include lack of sleep. The current headache began approximately two weeks ago. The location is primarily left temporal and frontal. The pain radiates to the neck. She characterizes the headache as moderate in severity and throbbing. Associated symptoms include sinus congestion, vision disturbance (scotoma) and vomiting. She denied fever. She has been taking Topamax, 100 mg q hs. She has been taking Relpax in the last week without improvement.

See Transcript at 350. Beaton recorded Loude's medications to include Relpax and Topamax. He diagnosed migraine headaches without aura and prescribed medications that included Toradol, Phenergan, and Ondansetron.

3

Chan saw Loude on March 31, 2014, for her migraine headaches. See Transcript at 382-384. He noted that Topamax had reduced the number of her headaches by about fifty percent. She had, though, experienced a headache that persisted for one week. He diagnosed a migraine headache and prescribed Topiramate. He ordered an MRI of her brain, the results of which were normal. See Transcript 380.

Chan saw Loude again on November 7, 2014, and noted that she continued to experience migraine headaches. See Transcript at 377-378. He increased her dosage of Topamax and prescribed Imitrex. He also ordered an EEG and a twenty-four hour Holter monitor.

On November 29, 2014, Loude was visiting her family in Detroit, Michigan, when she sought emergency care for her complaints of migraine headaches and episodes of syncope. See Transcript at 315-332. Her history of present illness was recorded to include the following:

> … [Loude] has long history of migraine headaches since teenager, usually she has migraine[s] with aura characterized by flashing light and sometimes … severe bilateral headache[s]. She lately has daily headaches. … They just increased Topamax to 200 milligrams twice a day. She just started with the increased doses. … She has a strong history of migraine[s] in her mother.

See Transcript at 318. A CT scan of her brain was normal, as were an MRI of her brain and an MRA of her head. Her symptoms were believed to be consistent with "complicated migraine versus syncope secondary to vasogenic or arrhythmia, rule out seizure activity." See Transcript at 319. Loude was diagnosed with, inter alia, "[d]ifficult to control migraines." See Transcript at 321. She was continued on Topamax and started on Amitriptyline.

4

Beaton saw Loude on December 10, 2014, for her complaints of migraine headaches. See Transcript at 358-360. He recorded her history of present illness and noted, in part, that she felt "a little different since the Topamax was increased." See Transcript at 358. He noted, though, that the earlier CT scan of her head and MRI of her brain had been within normal limits. He believed her symptoms to be likely Topamax-related and recommended that she contact Chan to modify the medications.

On April 6, 2015, Dr. Kenneth Jones, Ph.D., ("Jones") saw Loude for a mental diagnostic evaluation. See Transcript at 392-396. His evaluation is relevant to her migraine headaches and her ability to work because he noted, in part, the following:

> … [Loude] states she has made multiple applications for disability benefits. When asked why she considers herself unable to work at this time, she states, "I have a pinched nerve in my back … and it makes me black out …" … She begins the evaluation as alert, lucid, and focused on our discussion, but her overall demeanor changes significantly when the cognitive functioning subtests are administered, finding her presenting herself as about to fall asleep in her chair, and rolling her eyes back … as she rocks back and forth. At the conclusion of the evaluation, she resumes her alert state and stands up easily and leaves the room with no problems.
> …
>
> …
>
> … [Loude] states she last worked in 2003 after four months as a housekeeper at a local hotel. She states the job ended only because of her then pregnancy. She states she performed the job well, but that she was "bedridden with the next child in 2005, so I didn't return to work …" She is married for 12 years and has two young children (ages 10 and 11). She states she is the primary caregiver to the kids, and she lives independently with her husband and kids. She reports her personal interests as watching television and reading, and socially, she does well spending time with friends and family and does not experience social discomfort or anxiety.

See Transcript at 392, 393.

5

Chan saw Loude on April 13, 2015, for her continued complaints of migraine headaches. See Transcript at 403-404. He noted that she reported having daily headaches with migraine flare ups. He noted, though, that the results of the Holter monitor were within normal limits. He started her on a trial of Midrin for her headaches.

Chan completed a Treating Physician's Migraine Headache Form on Loude's behalf on April 13, 2015 ("headache questionnaire"). See Transcript at 397. In the document, he represented that Loude experiences more than one headache a week with aura, and the headaches have a duration of between four to six hours. The headaches are accompanied by nausea, vomiting, photophobia, phonophobia, and throbbing/pulsating. He has prescribed Topamax, Elavil, and Imitrex for the headaches, and her response to the medications has been fair. He opined that her headaches would interfere with her ability to work and cause her to miss work about twice a week.

A nurse practitioner in Chan's office, Ashley Ward ("Ward"), appears to have begun seeing Loude on August 31, 2015. See Transcript at 477-478. Loude continued to complain of migraine headaches accompanied by nausea and vomiting. Ward started Loude on Lamictal; refilled her prescription of Imitrex; and administered trigger point injections, a second round of which Ward administered on September 30, 2015. See Transcript at 479-480.

Chan saw Loude again on November 13, 2015. See Transcript at 484-485. Loude reported that although she continued to experience migraine headaches, she obtained greater benefit from Lamictal than from Topamax. Chan restarted Loude on Lamictal, refilled her prescription for Imitrex, and ordered additional trigger point injections. He also discussed the option of a Zecuity patch.

Ward saw Loude on January 6, 2016, for a follow-up examination. See Transcript at 486-487. Loude reported that her migraine headaches had improved with the use of Lamictal, but she continued to experience about three headaches a week. She had begun using a Zecuity patch and reported good results with it. Ward increased Loude's dosage of Lamictal and continued her on Imitrex and a Zecuity patch.

Ward saw Loude again on February 9, 2016. See Transcript at 491-493. Although Loude continued to have migraine headaches, the severity of her headaches had decreased with the use of Lamictal and a Zecuity patch. She reported, though, that her insurance did not provide coverage for a Zecuity patch. Ward observed that the following testing had all been within normal limits: 1) a November 7, 2014, EEG; 2) a May 5, 2014, MRI of Loude's brain; and 3) a May 6, 2015, CT scan of Loude's head. Ward administered trigger point injections, increased Loude's dosage of Lamictal, continued her on Imitrex and a Zecuity Patch, and refilled her prescription for Phenergan.

Ward saw Loude on April 14, 2016, for a follow-up examination. See Transcript at 507-513. Ward's progress note includes the following notations:

> … [Loude's] [m]igraines have improved on the Lamictal but she continues to have about 3 a week. The [m]igraines can last a full 24 hours and she can wake up with the migraines. [She] has greater than 15 migraines a month with her migraines lasting longer than 4 hours. She tried the samples of Zecuity patch that was shipped to her by the company and it works really well for her. We have tried several times to get her insurance to cover the patches but so far have been unsuccessful. She continues to take the Imitrex tablets and injections. Her [m]igraines have been uncontrolled while taking: Lamictal, Topamax, Amitriptyline, Zoloft. For abortives she has tried Imitrex tablets and injections, maxalt, treximet, and zecuity. She is also taking Zanaflex and receiving [trigger point] injections which have helped some with her neck tension and her tension headaches. Her migraine[s] are affecting her ability to be able to function. Discussed the potential risks and complications of Botox. …

7

See Transcript at 507. Ward administered trigger point injections, restarted Loude on Topamax, refilled her prescriptions for Lamictal and Imitrex, and continued to evaluate her use of a Zecuity patch.[2]

Loude and other individuals completed a series of documents in connection with Loude's application. See Transcript at 213-214, 215-222, 223-224, 225-226, 227-228, 229-230. The documents reflect that Loude has difficulty attending to her personal care, does not prepare any meals, can do some house work, but can do no yard work. She leaves her home to attend her children's school events and to keep her appointments with her physicians. She has various hobbies and interests and enjoys spending time with others. Loude reported some part-time janitorial, medical, and factory work, see Transcript at 205, but a summary of her FICA earnings reflects that she has never worked full-time, see Transcript at 183.

Loude testified during the administrative hearing. See Transcript at 31-45. She is unable to drive an automobile because her headaches can cause her to lose consciousness. She stopped working temporary jobs after she became pregnant. She is taking prescription medications for her headaches, medications that include Zecuity patches, Imitrex, and Lamictal. Her headaches do not occur at the same time each day. Although she typically experiences headaches in the morning when she awakens, they can occur later in the day. They are accompanied by symptoms that include white spots, dizziness, and nausea. On the days she experiences headaches, she would not be able to work an entire eight hour workday.

---

[2] Ward appears to have seen Loude on May 13, 2016. See Transcript at 499-506. The findings and observations made by Ward during that examination are substantially similar to the findings and observations she made during her April 14, 2016, examination.

The ALJ found that Loude's severe impairments include migraine headaches. He assessed her residual functional capacity and found that she can perform sedentary work with the following limitations:

> … [Loude] can occasionally stoop, crouch, crawl, and kneel; no exposure to respiratory irritants; [she] is able to perform work where interpersonal contact is incidental to the work performed, incidental is defined as interpersonal contact requiring a limited degree of interaction such as meeting and greeting the public, answering simple questions, accepting payment and making change; and complexity of tasks can be learned by demonstration or repetition within 30 days, few variables, and little judgment; supervision required is simple, direct, and concrete.

See Transcript at 17. In assessing Loude's residual functional capacity, the ALJ found the following with respect to her migraine headaches:

> … Regarding the claimant's migraines, while the record shows that the claimant consistently reports issues with migraines and syncopal episodes, the record shows that the claimant's syncopal episodes are only secondary to the claimant's migraines. … Moreover, testing revealed only normal results. An MRI of the claimant's brain, an EEG, and a CT scan of the claimant's head were all normal. … Moreover, although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in nature. For instance, on a number of occasions, the claimant was simply advised to continue her medication regimen. … In addition, the record shows that the claimant's medication has actually helped control and lessen the claimant's migraines.

See Transcript at 18-19. The ALJ gave little weight to Chan's opinions in the headache questionnaire because "the writing is unreadable and little explanation is given in regards to the opinion that the claimant's migraines interfere with her ability to work." See Transcript at 20. The ALJ found that Loude has no past work but found that there is other work a hypothetical individual with her limitations can perform.

9

The first reason the ALJ gave for discounting Chan's opinions in the headache questionnaire is not particularly compelling. Although Chan's penmanship is not exceptional, it is passable. The second reason the ALJ gave—Chan provided little explanation in the headache questionnaire for his opinions—is supported by substantial evidence on the record as a whole, although some additional clarification is necessary. The Court has reviewed the headache questionnaire in light of Chan's progress notes. Having done so, the Court finds that Chan's opinions in the headache questionnaire could properly be discounted because they are inconsistent with the record as a whole, and substantial evidence on the record as a whole supports the weight the ALJ ultimately gave Chan's opinions. The Court so finds for three reasons.

First, Chan's opinions are inconsistent with the medical testing. Beaton's May 19, 2014, progress note reflects that an MRI of Loude's brain was normal. See Transcript at 380. A CT scan of Loude's head was performed on November 29, 2014, after she presented to an emergency room complaining of migraine headaches and episodes of syncope. The results of the CT scan revealed "[n]o acute intracranial abnormalities." See Transcript at 331. MRI testing of her brain and MRA testing of her head were also performed during the emergency room presentation on November 29, 2014, and the results revealed no abnormalities. See Transcript at 332. Loude underwent other testing, and the results were all within normal limits. Specifically, the record reflects that EEG was performed on November 7, 2014; an MRI of Loude's brain was performed on May 5, 2014; and a CT scan was performed on May 6, 2015. Ward observed in her February 9, 2016, progress note that the results of the testing were all within normal limits. See Transcript at 491-492.

Second, Chan's opinions are not supported by his own progress notes. The Court recognizes that migraine headaches are oftentimes difficult to measure and depend to a large extent upon the claimant's self-reports. In this instance, Chan's opinions, and the findings and observations he made in his notes, are based solely upon Loude's self-reports about the quantity, duration, severity, and symptomology of her headaches and nothing else. His physical examinations reflect largely normal findings. For instance, he observed that she had intact cranial nerves, normal reflexes and motor strength, no sensory deficits, normal pupils. He also opined that her symptoms include phonophobia, but she appears to have made no mention of phonophobia as a symptom of her headaches. Although he could credit her self-reports, he gave no reason for doing so.

Third, Chan's opinions are inconsistent with other evidence in the record. For instance, his opinions are inconsistent with a chiropractor's progress notes. On nine occasions between January 18, 2014, and February 19, 2014, Loude sought treatment from a chiropractor. See Transcript at 292-297. Loude repeatedly denied that she had headaches.

Chan's opinions are inconsistent with the representations Loude made during the April 6, 2015, mental diagnostic evaluation. She reported during the evaluation that she stopped working in 2003 when she became pregnant with her first child and did not return to work after she became bedridden with her second child in 2005. See Transcript at 393. She represented that she is unable to work because she has a pinched nerve in her back, and it causes her to black out. See Transcript at 392. She made no mention of stopping work, or of being unable to work, because of the problems associated with her migraine headaches.

Chan's opinions are also inconsistent with Loude's daily activities. Her migraine headaches do not prevent her from acting as the primary caregiver to her children, reading, socializing with family and friends, and traveling out-of-state. It is also worth observing that Jones found Loude to be less than credible regarding her complaints, noting that her "presentation overall does at time appear to be contrived and exaggerated." See Transcript at 396.

Loude faults the ALJ for failing to recontact Chan so that he might clarify his opinions. The ALJ committed no error when he did not ask Chan to clarify his opinions. "[O]nce an ALJ concludes, based on sufficient evidence, that the treating doctor's opinion is inherently contradictory or unreliable, he or she is not generally required to seek more information from that doctor." See Samons v. Astrue, 497 F.3d 813, 819 (2008). Here, substantial evidence on the record as a whole supports the ALJ's determination that Chan's opinions should only be given little weight, and the ALJ was not required to recontact Chan.

The question for the ALJ was not whether Loude experiences headaches. The question was the severity of her headaches and the extent to which they impact her residual functional capacity. He could and did find that she experiences headaches, but they are not as severe as she alleges. He could and did find that her headaches are amenable to medication as she reported that Lamictal and Zecuity patches help decrease the severity of her headaches.

On the basis of the foregoing, there is substantial evidence on the record as a whole to support the ALJ's findings. Loude's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 8th day of January, 2018.

_____
UNITED STATES MAGISTRATE JUDGE